1

2

3

4

5

6

7

8

9

10

11            **IN THE UNITED STATES DISTRICT COURT**

12            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

13

14   GINA MESA,                           CASE NO. CV F 06-1055 LJO TAG

15                   Plaintiff,          **SUMMARY JUDGMENT/ADJUDICATION
                                          DECISION**
16          vs.                           (Doc. 15.)

17   MODERN WOODMEN
     OF AMERICA,
18
                     Defendant.
19   _____/

20                            **INTRODUCTION**

21          Defendant Modern Woodmen of America ("Modern Woodmen") seeks summary

22   judgment/adjudication on plaintiff Gina Mesa's ("Ms. Mesa's") quid pro quo sexual harassment and

23   hostile work environment claims. Modern Woodmen contends that Ms. Mesa lacks evidence that a term

24   of her employment was conditioned on acceptance of her supervisor's sexual advances for her quid pro

25   quo sexual harassment claim. Modern Woodman argues that Ms. Mesa lacks evidence of sufficiently

26   severe or pervasive harassment for her hostile work environment claim. Ms. Mesa responds that she has

27   raised sufficient factual issues to defeat summary judgment/adjudication. This Court considered Modern

28   Woodmen's summary judgment/adjudication motion on the record and VACATES the October 31, 2007

                                        1

hearing, pursuant to Local Rule 78-230(h).  For the reasons discussed below, this Court[1] DENIES

Modern Woodman summary judgment/adjudication.

## BACKGROUND[2]

### Ms. Mesa's Employment With Modern Woodmen

On November 1, 2004, Modern Woodmen, a financial services firm, hired Ms. Mesa as an

administrative assistant at its Bakersfield office at the recommendation of Virgilio "Billy" Raviz ("Mr.

Raviz"), manager of Modern Woodmen's Bakersfield office.  Ms. Mesa was placed on a 90-day

probationary period and was supervised by Mr. Raviz until her termination on January 20, 2005, when

she left the office unattended during business hours to go home for a personal errand.  According to

Modern Woodmen, additional problems contributed to Ms. Mesa's termination and included tardiness,

lack of knowledge regarding Modern Woodmen policies, poor performance and time management, and

improper use of make-up time.

### Mr. Raviz' Alleged Harassment

During three to five weeks of her employment prior to January 1, 2005, Ms. Mesa claims that

Mr. Raviz harassed her in that he stared at her, stood closely behind her, implied that he should be her

boyfriend, asked to accompany him on a day long business trip out of town, kissed her cheek, and told

her that she is beautiful.

### *Comments And Staring*

Ms. Mesa attributes Mr. Raviz to comment that she was beautiful no less than twice a day during

a three-to-five week period.  Ms. Mesa responded with "thank you," walking away or ignoring Mr.

Raviz.  According to Ms. Mesa, Mr. Raviz stared at her with eye-to-eye contact when sitting across a

conference room table or looking her up and down "as if he was disrobing me in his mind."  In her

---

[1]     This Court carefully reviewed and considered all arguments, points and authorities, declarations, depositions, exhibits, statements of undisputed facts and responses thereto, objections and other papers filed by the parties. Omission of reference to an argument, document, paper or objection is not to be construed to the effect that this Court did not consider the argument, document, paper or objection.  This Court thoroughly reviewed and considered the evidence it deemed admissible, material and appropriate for summary judgment/adjudication.

[2]     The parties generally agree on the pertinent facts.  In fact, Ms. Mesa adopts Modern Woodmen's statement of undisputed facts.

2

declaration, Ms. Mesa states: "His constant staring at me made me feel I was in the presence of someone who was desiring me sexually." Although the comments and staring bothered Ms. Mesa, she did not inform Mr. Raviz that she did not care for the comments or staring.

Ms. Mesa attributes Mr. Raviz to call her "his little Alicia" several times (weekly) during December 2004. Alicia is the name of Mr. Raviz' wife, who also worked at Modern Woodmen's Bakersfield office. Mr. Raviz immediately apologized when Ms. Mesa noted that she was not his wife. Mr. Raviz never called Ms. Mesa "his little Alicia" in the presence of others. The "little Alicia" comments added to Ms. Mesa's impression that Mr. Raviz "wanted me to become involved with him romantically."

Ms. Mesa attributes Mr. Raviz to call her a flirt. Ms. Mesa responded that she was a talkative person, not a flirt. Ms. Mesa claims Mr. Raviz objected and again referred to her as a flirt.

Ms. Mesa attributes Mr. Raviz to tell her occasionally that she needed five boyfriends. Ms. Mesa interpreted the five boyfriends comment to mean that Mr. Raviz wanted to be her boyfriend. Ms. Mesa advised Mr. Raviz that she had a boyfriend, "Bob." Ms. Mesa acknowledges that Mr. Raviz never stated that he wanted to be her boyfriend.

Ms. Mesa attributes Mr. Raviz in December 2004 to tell her that she might want to come to his home when she asked for his address to pass on to an invited guest to Mr. Raviz' Christmas party.

### Business Trip

In late December 2004, Mr. Raviz asked Ms. Mesa to accompany him on a January 3, 2005 day-long business trip to Salinas to take notes as his assistant. Ms. Mesa attributes Mr. Raviz to have asked whether her boyfriend would be upset that she had to go on a day-long business trip. Ms. Mesa responded that her boyfriend should not be upset because the trip was part of her job. Ms. Mesa claims that Mr. Raviz said: "Okay. Well, it's going to be just you and I. . . . Well, you know, sometimes, you know, us men, you know, get excited so. . . . Oh, excuse me, never mind." Mr. Raviz covered his mouth when he made the comment. Ms. Mesa did not inform Mr. Raviz that his comments made her uncomfortable although she thought that Mr. Raviz indicated that he was excited they would be alone. Ms. Mesa claims that she did not want to go on the trip but did not tell Mr. Raviz that she could not or would not go.

1

### *Peck On The Cheek*

2   Ms. Mesa claims that near the end of December 2004, Mr. Raviz gave her a peck on the cheek

3 and brushed his hand against hers at the same time.

4

### *Standing Behind Ms. Mesa*

5   Ms. Mesa claims that Mr. Raviz stood behind her chair daily to periodically check her work.

6 Occasionally, Mr. Raviz told Ms. Mesa that she needed to do something differently or correct a mistake.

7 Although she felt uncomfortable, Ms. Mesa concedes that such conduct of Mr. Raviz was appropriate.

8

### **Ms. Mesa's Arrest**

9   Ms. Mesa was arrested at approximately 12 a.m. on January 2, 2005 for being under the influence

10 of PCP.  Ms. Mesa missed work and the Salinas business trip with Mr. Raviz on January 3, 2005.

11

### **End Of Alleged Harassment**

12   Ms. Mesa acknowledges that she was not harassed from the end of December 2005 to her

13 January 20, 2005 termination.  In her declaration, Ms. Mesa notes that Mr. Raviz' attitude changed after

14 she did not attend the Salinas trip:

15
16
17
> The impression I received . . . was that Mr. Raviz was personally upset about me not going to Salinas.  After that trip, his attitude changed towards me.  First and foremost, his harassment of me stopped.  He no longer stared, called me beautiful, attempted to kiss me, call me his Little Alicia, or claim I needed more boyfriends.

18 Ms. Mesa further notes that prior to January 2005, Mr. Raviz daily praised her for a "great job" and that

19 she received a raise on January 1, 2005.  Ms. Mesa attributes Mr. Raviz to tell her that she would receive

20 summer 2005 training at Modern Woodmen's out-of-state headquarters.  Ms. Mesa declares:

21
22
23
> After the Salinas incident he no longer told me I was doing a good job and he no longer told me that I would be receiving training.  His attitude toward me clearly changed after the Salinas trip incident.  Mr. Raviz had always been complimentary and warm to me before, but he became cold and icy to me afterwards.

24

### **Reprimand And Termination**

25   Mr. Raviz provided Ms. Mesa a January 16, 2005 written reprimand to criticize her working less

26 than time reported, tardiness, dress attire, use of telephone for personal matters, failure to monitor

27 answering machine, and failure to adhere to Modern Woodmen procedures.  On January 20, 2005, Ms.

28 Mesa was terminated and given a copy of her January 19, 2005 performance review that she needed

1  improvement in all but the performance category.  Mr. Raviz prepared the review.

2      Prior to her termination, Ms. Mesa never indicated to Mr. Raviz or anyone else at Modern

3  Woodman that Mr. Raviz' alleged sexual advances were offensive or unwanted.

4  **Telephone Call**

5      Ms. Mesa declares that on May 3, 2006, Mr. Raviz telephoned her on her cell phone: "I heard

6  Mr. Raviz's voice then say 'it's me.'  I froze and then hung up the phone."

7  **Ms. Mesa's Claims**

8      Ms. Mesa pursues California Fair Employment and Housing Act ("FEHA"), §§ 12900, et seq.,

9  causes of action for (first) quid pro quo sexual harassment and (second) hostile work environment.  In

10  her complaint, Ms. Mesa alleges that soon after she started her employment, Mr. Raviz made sexual

11  advances toward Ms. Mesa in that he: (1) told her how beautiful she is; (2) advised her that she needed

12  a new boyfriend to imply he could be her boyfriend; (3) indicated she excited him; (4) called her a pet

13  name; (5) kissed her; (6) stared at her; (7) stood close to her; and (8) requested her to travel a long

14  distance with him in his vehicle. Ms. Mesa alleges that shortly after she rebuffed Mr. Raviz' advances,

15  she was reprimanded and terminated.  Ms. Mesa's (first) quid pro quo sexual harassment claim alleges

16  her termination was motivated by her rebuffs of Mr. Raviz' advances.  Ms. Mesa's (second) hostile work

17  environment cause of action is premised on Mr. Raviz' alleged advances.

18      Modern Woodmen contends that Ms. Mesa's (first) quid pro quo sexual harassment cause of

19  action fails in that Ms. Mesa's employment was not conditioned on acceptance of Mr. Raviz' sexual

20  advances.  Modern Woodmen further contends that Ms. Mesa was subjected to no more that sporadic

21  and trivial incidents which are insufficient to constitute sexual harassment.

22  **DISCUSSION**

23  **Summary Judgment/Adjudication Standards**

24      F.R.Civ.P. 56(b) permits a party against whom a claim is asserted to seek "summary judgment

25  in the party's favor upon all or any part thereof."  Summary judgment/adjudication is appropriate when

26  there exists no genuine issue as to any material fact and the moving party is entitled to

27  judgment/adjudication as a matter of law. F.R.Civ.P. 56(e); *Matsushita Elec. Indus. v. Zenith Radio*

28  *Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec.*

1  *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment/adjudication

2  is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial."

3  *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin*

4  *Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

5      On summary judgment/adjudication, a court must decide whether there is a "genuine issue as to

6  any material fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56(c);

7  *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress*

8  *& Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464,

9  467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th

10 Cir. 1984). The evidence of the party opposing summary judgment/adjudication is to be believed and

11 all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of

12 the opposing party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986);

13 *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.  The inquiry is "whether the evidence presents a sufficient

14 disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as

15 a matter of law."  *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

16      To carry its burden of production on summary judgment/adjudication, a moving party "must

17 either produce evidence negating an essential element of the nonmoving party's claim or defense or

18 show that the nonmoving party does not have enough evidence of an essential element to carry its

19 ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210

20 F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d

21 563, 574 (9th Cir. 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party

22 must persuade the court that there is no genuine issue of material fact."  *Nissan Fire*, 210 F.3d at 1102;

23 *see High Tech Gays*, 895 F.2d at 574.  "As to materiality, the substantive law will identify which facts

24 are material.  Only disputes over facts that might affect the outcome of the suit under the governing law

25 will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

26      "If a moving party fails to carry its initial burden of production, the nonmoving party has no

27 obligation to produce anything, even if the nonmoving party would have the ultimate burden of

28 persuasion at trial."  *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598.

1    "If, however, a moving party carries its burden of production, the nonmoving party must produce

2    evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d

3    at 574.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material

4    fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see*

5    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry of

6    summary judgment, after adequate time for discovery and upon motion, against a party who fails to make

7    the showing sufficient to establish the existence of an element essential to that party's case, and on

8    which that party will bear the burden of proof at trial.") "But if the nonmoving party produces enough

9    evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan*

10   *Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.  "The amount of evidence

11   necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the

12   parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting

13   *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)).  "The mere

14   existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*,

15   477 U.S. at 252, 106 S.Ct. 2505.

16        Under F.R.Civ.P. 56(c), a summary judgment/adjudication motion, interlocutory in character,

17   may be rendered on the issue of liability alone.  "In cases that involve . . . multiple causes of action,

18   summary judgment may be proper as to some causes of action but not as to others, or as to some issues

19   but not as to others, or as to some parties, but not as to others." *Barker v. Norman*, 651 F.2d 1107, 1123

20   (5th Cir. 1981); *see also Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990); *Cheng v.*

21   *Commissioner Internal Revenue Service*, 878 F.2d 306, 309 (9th Cir. 1989).  A court "may grant

22   summary adjudication as to specific issues if it will narrow the issues for trial." *First Nat'l Ins. Co. v.*

23   *F.D.I.C.*, 977 F.Supp. 1051, 1055 (S.D. Cal. 1977).

24        As discussed below, Ms. Mesa has raised factual issues to avoid summary judgment/adjudication

25   of her quid pro quo harassment and hostile work environment causes of action.

26                                    **Public Policy**

27        Ms. Mesa proceeds under FEHA which declares "as the public policy of this state that it is

28   necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold

employment without discrimination or abridgment on account of . . . sex . . ." Cal. Gov. Code, § 12920. California Government Code section 12940(a) renders unlawful an employer because of sex "to discriminate against the person in compensation or in the terms, conditions, or privileges of employment."  California Government Code section 12940(j)(1) renders unlawful an employer "to harass an employee" because of sex.  Under the FEHA scheme, "'harassment' because of sex" includes sexual harassment and gender harassment.  Cal. Gov. Code, § 12940(j)(4)(C).

California law recognizes two theories of sexual harassment:

1.    Quid pro quo harassment – a term of employment is conditioned on submission to unwelcome sexual advances; and

2.    Hostile work environment – harassment is sufficiently pervasive to alter conditions of employment and to create an abusive work environment.

*Mogilefsky v. Superior Court*, 20 Cal.App.4th 1409, 1414, 26 Cal.Rptr.2d 116, 118 (1993); *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 607, 262 Cal.Rptr. 842 (1989).

**Quid Pro Quo Sexual Harassment**

In *Mogilefsky*, 20 Cal.App.4th at 1414, 26 Cal.Rptr.2d at 118, the California Court of Appeal explained quid pro quo sexual harassment:

> A cause of action for quid pro quo harassment involves the behavior most commonly regarded as sexual harassment, including, e.g., sexual propositions, unwarranted graphic discussion of sexual acts, and commentary on the employee's body and the sexual uses to which it could be put. (*Donald Schriver, Inc. v. Fair Employment & Housing Com*. (1986) 220 Cal.App.3d 396, 405, 230 Cal.Rptr. 620.) To state a cause of action on this theory, is it sufficient to allege that a term of employment was expressly or impliedly conditioned upon acceptance of a supervisor's unwelcome sexual advances. (*See Bihun v. AT & T Information Systems, Inc.* (1993) 14 Cal.App.4th 1283A, 13 Cal.App.4th 976, 1005, 16 Cal.Rptr.2d 787.)

In cases of implied sexual coercion, courts require more than conclusory allegations that the supervisor proposed a sexual liaison and that the employee responded to overtures to protect her employment interests.  *See Holly D. v. California Institute of Technology*, 339 F.3d 1158, 1174 (9th Cir. 2003).

Modern Woodmen argues that Ms. Mesa fails to establish quid pro quo harassment in that her employment's terms and conditions were neither expressly nor impliedly conditioned on acceptance of Mr. Raviz' alleged sexual advances.  Modern Woodmen argues that Ms. Mesa's failure to attend the

1   Salinas business trip with Mr. Raviz does not establish an explicit quid pro quo claim.  Modern

2   Woodmen claims that there is no implicit quid pro quo claim in the absence of evidence to connect Ms.

3   Mesa's job or related matters to Mr. Raviz' requests to engage in sexual conduct.  Modern Woodsmen

4   notes that Mr. Raviz' "beautiful" comments do not equate to quid pro quo harassment.  Modern

5   Woodmen concludes that the "mere fact that [a supervisor] was interested in sex generally and desired

6   to have sex with [subordinate plaintiff] is simply not enough."  *See Holly D.*, 339 F.3d at 1176.

7        Ms. Mesa concedes that Mr. Raviz "did not come out and tell [her] her job was on the line if she

8   did not succumb to his advances."  Ms. Mesa argues that Mr. Raviz' advances were "coy" given that Mr.

9   Raviz' wife worked with Mr. Raviz and Ms. Mesa and Mr. Raviz "knew he had to be careful about how

10  he approached" a relationship with Ms. Mesa.  Ms. Mesa offers that Mr. Raviz' staring and comments

11  (her beauty, "little Alicia," needing boyfriends, men "getting excited," and being alone together)

12  demonstrate that Mr. Raviz sought a sexual relationship with Ms. Mesa.  Ms. Mesa surmises that after

13  she failed to make the Salinas trip, Mr. Raviz realized she would not engage in a sexual relationship,

14  ceased his advances and terminated her employment.  Ms. Mesa equates Mr. Raviz' change in attitude

15  as "evidence of an improper retaliatory motive," especially since prior to the trip, Mr. Mesa praised her

16  daily and she received a raise.  Ms. Mesa contends that the timing of her January 16, 2005 reprimand

17  and termination four days later raise factual issues to avoid summary judgment.

18       The parties agree that Mr. Raviz did not **directly or explicitly** make sexual propositions, discuss

19  sex acts, or comment on Ms. Mesa's body for sex.  Nonetheless, the inferences from the evidence are

20  that Mr. Raviz courted a sexual relationship to be explored on the Salinas business trip.  The evidence

21  further suggests that Mr. Raviz felt rejected after Ms. Mesa missed the Salinas trip and in turn ceased

22  his advances.  Thirteen days after the trip, Ms. Mesa was reprimanded and terminated four days later,

23  despite her claims that Mr. Raviz had praised her.  The evidence minimally raises a factual issue that Ms.

24  Mesa's continued employment was conditioned on acceptance of Mr. Raviz' advances based on her

25  reprimand and termination after she missed the Salinas business trip.

26       Another consideration is the conditions under which Ms. Mesa worked.  The evidence reveals

27  that the office was occupied by Ms. Mesa, Mr. Raviz and his wife.  Such working arrangement advances

28  Ms. Mesa's claim in that "the supervisory nature of the employment relationship" between Ms. Mesa

9

and Mr. Raviz "must be considered when determining whether a reasonable woman in [Ms. Mesa's] position would have believed that her continued employment was contingent on engaging in sexual acts with her supervisor." *Holly D.*, 339 F.3d at 1176, n. 21.  Mr. Raviz was not as overt as in other cases of quid pro quo harassment, but his wife's office presence explains his toned down approach, especially considering his conduct regarding the Salinas trip.

In sum, a reasonable inference from the evidence is that Mr. Raviz continued his advances until he decided to address her employment conditions through reprimand and ultimate termination.  At that point, a factual issue arises as to conditions for her continued employment to avoid summary judgment/adjudication on Ms. Mesa's (first) quid pro quo cause of action.

### Hostile Work Environment Harassment

A plaintiff employee claiming sexual harassment based upon a hostile work environment "must demonstrate the conduct complained of was severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their sex." *Lyle v. Warner Bros. Television Productions,* 38 Cal.4th 264, 279, 42 Cal.Rptr.3d 2 (2006).[3]  A hostile environment claim "need not have anything to do with sexual advances. . . . It shows itself in the form of intimidation and hostility for the purpose of interfering with an individual's work performance. . . . To plead a cause of action for this type of sexual harassment, it is 'only necessary to show that gender is a substantial factor in the discrimination and that if the plaintiff had been a man she would not have been treated in the same manner.'" *Accardi v. Superior Court*, 17 Cal.App.4th 341, 348, 21 Cal.Rptr.2d 292 (1998).  A cause of action for sexual harassment on a hostile environment theory need not allege "any sexual advances whatsoever." *Mogilefsky*, 20 Cal.App.4th at 1414-1415, 26 Cal.Rptr.2d at 118-119.

Nonetheless, "FEHA's prohibitions are not a 'civility code' and are not designed to rid the workplace of vulgarity." *Sheffield v. Los Angeles County Dept. of Social Services*, 109 Cal.App.4th 153, 161, 134 Cal.Rptr.2d 492 (2003).  The ordinary tribulations of the workplace, including sporadic use of

---

[3]     To establish a hostile environment claim under Title VII of the Civil Rights Act, a plaintiff must show: (1) she as subjected to verbal or physical conduct of a sexual nature; (2) such conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of plaintiff's employment and to create an abusive working environment. *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995).

1   abusive language, gender-related jokes, and occasional teasing, do not constitute a hostile environment.

2   *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275 (1998) (Title VII of the Civil Rights

3   Act of 19964 does not become a "general civility code.")[4] "[A]nnoying or 'merely offensive' comments

4   in the workplace are not actionable."  *Lyle*, 38 Cal.4th 264, 283, 42 Cal.Rptr.3d 2.

5        Not all workplace conduct which may be described as harassment affects a term, condition, or

6   privilege of employment.  *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399 (1986);

7   *Aguilar v. Avis Rent A Car System, Inc.*, 21 Cal.4th 121, 129-130, 87 Cal.Rptr.2d 132, 138 (1999), *cert.*

8   *denied*, 529 U.S. 1138, 120 S.Ct. 2029 (2000).  "To be actionable, 'a sexually objectionable environment

9   must be both objectively and subjectively offensive, one that a reasonable person would find hostile or

10  abusive, and one that the victim in fact did perceive to be so.'" *Lyle*, 38 Cal.4th at 283, 42 Cal.Rptr.3d

11  2 (quoting *Faragher,* 524 U.S. at 787, 118 S.Ct. 2275. "The plaintiff must prove that the defendant's

12  conduct would have interfered with a reasonable employee's work performance and would have

13  seriously affected the psychological well-being of a reasonable employee and that she was actually

14  offended."  *Fisher*, 214 Cal.App.3d at 609-610, 262 Cal.Rptr. 842.  If the victim does not subjectively

15  perceive the environment to be abusive, the conduct has not actually altered the conditions of the

16  victim's employment, and there is no actionable harassment.  *Harris v. Forklift Systems, Inc.,* 510 U.S.

17  17, 21-22, 114 S.Ct. 367, 370-371 (1993).

18        "Harassment cannot be occasional, isolated, sporadic, or trivial[;] rather the plaintiff must show

19  a concerted pattern of harassment of a repeated, routine or a generalized nature."  *Fisher*, 214

20  Cal.App.3d at 610, 262 Cal.Rptr. 842.  A plaintiff must prove more than a few isolated incidents.  *See*

21  *Gilbert v. City of Little Rock*, 722 F.2d 1390, 1394 (8th Cir. 1983), *cert. denied*, 466 U.S. 972, 104 S.Ct.

22  2347 (1984); *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2nd Cir. 1986).

23        Courts apply "a totality of the circumstances test to determine whether a plaintiff's allegations

24  make out a colorable claim of hostile work environment."  *Brooks v. City of San Mateo*, 229 F.3d 917,

25  _____

26        [4]       Federal and California courts rely on federal interpretations of Title VII of the Civil Rights Act of 1964,
    42 U.S.C. §§ 2000e, et seq., to interpret analogous FEHA provisions which prohibit unlawful discrimination and harassment.
27  *Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270 (9th Cir. 1996); *Beyda v. City of Los Angeles*, 65 Cal.App.4th 511,
    517, 76 Cal.Rptr.2d 547 (1998); *Clark v. Claremont Univ. Ctr. & Graduate Sch.*, 6 Cal.App.4th 639, 662, 8 Cal.Rptr.2d 151
28  (1992).

923 (9th Cir. 2000); *Fisher,* 214 Cal.App.3d 590, 609, 262 Cal.Rptr. 842.  Factors considered include (1) the nature of the unwelcome sexual acts or works (generally, physical touching is more offensive than unwelcome verbal abuse); (2) the frequency of the offensive encounters; (3) the total number of days over which all of the offensive conduct occurs; and (4) the context in which the sexually harassing conduct occurred. *Fisher*, 214 Cal.App.3d 590, 610, 262 Cal.Rptr. 842.

Modern Woodmen contends that Mr. Raviz' conduct lacks necessary severity or pervasiveness for a hostile environment claim.  Modern Woodmen argues that Mr. Raviz' single, brief kiss on Ms. Mesa's cheek and hand-to-hand brush does amount to an unwelcome sexual act to establish a hostile work environment.  Modern Woodmen points to *Brooks*, 229 F.3d at 926, where the Ninth Circuit Court of Appeals held that a single incident of a co-worker forcing his hand under plaintiff's sweater to fondle her bare breast did not support a hostile work environment claim in that a reasonable woman in plaintiff's position would not consider the terms and conditions of her employment altered by the co-worker's actions.  *See also Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (a hand on shoulder, brief hug or peck on the cheek are "not severe enough to be actionable in and of themselves.")

As to frequency of offensive encounters, Modern Woodmen notes that Mr. Raviz' alleged misconduct occurred during three to five weeks of Ms. Mesa's 12-week tenure and ceased no less than three weeks prior to her termination with no expectation of future misconduct.  Modern Woodmen argues that Ms. Mesa fails to offer "specific facts" of frequency and duration of offensive acts other than Mr. Raviz' business trip comments and kiss on the check.  Modern Woodmen notes that Ms. Mesa offers no evidence as to how Mr. Raviz' alleged conduct affected her work or duties.

Ms. Mesa responds that there are sufficient factual issues of hostile work environment to be tried by a jury and points to several decisions where courts found incidents and conduct were sufficient to defeat summary judgment.

Having found factual issues as to quid pro quo harassment, this Court likewise finds factual issues of hostile work environment.  The conduct at issue includes Mr. Raviz' staring, looking Ms. Mesa from head-to-toe, sexually charged and implicit comments, a kiss and hand touching.  In total, such conduct raises factual issues whether Ms. Mesa's direct supervisor altered her employment conditions and created a hostile and abusive environment based on Ms. Mesa's sex.  A jury rationally could find

that Mr. Raviz' daily staring, comments and standing behind Ms. Mesa constitute intimidation which interfered with Ms. Mesa's work as evidence by her performance review.  Mr. Raviz' conduct, in total, exceeded mere trivialities and sporadic incidents of vulgarity.  A reasonable person in Ms. Mesa's position could find Mr. Raviz' conduct offensive and obstructive, as she did.  Although Mr. Raviz' conduct was limited to roughly a month, it occurred over a significant portion of Ms. Mesa's brief employment.  In contrast to cases on which Modern Woodmen relies, the creator of the hostile work environment was not a fellow co-worker; it was Ms. Mesa's direct supervisor with power to continue or terminate her employment.  As discussed above, Mr. Raviz' conduct was not explicitly graphic.  Nonetheless, its tone was sexual to reach objective and subjective offensive levels.  Given the nature of Ms. Mesa's situation, the fact that she did not complain prior to her termination is unavailing to Modern Woodmen.   The evidence is not so one-sided to entitle Modern Woodmen to summary judgment/adjudication on Ms. Mesa's (second) hostile work environment cause of action.

## CONCLUSION AND ORDER

For the reasons discussed above, this Court DENIES Modern Woodmen summary judgment/adjudication on Ms. Mesa's quid pro quo sexual harassment and hostile work environment causes of action.

IT IS SO ORDERED.

Dated:   **October 25, 2007**                          **/s/ Lawrence J. O'Neill**
                                                        UNITED STATES DISTRICT JUDGE